UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

DANIEL COOK,

        Plaintiff,

v.

CORIZON et al.,

        Defendants.

_____/

Case No. 2:18-cv-25

Honorable Paul L. Maloney

## **OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Scott, Michigan Department of Corrections, James, and Laitinen. The Court will serve the complaint against Defendants Corizon, Gluesing, Wixtrom, Papendick, Harbaugh, Sylvie, Bonefeld, Gerlach, Minard, Davis, and Christiansen.

## Discussion

### I.     Factual allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Ionia Correctional Facility (ICF) in Ionia, Ionia County, Michigan.  The events about which he complains occurred at that facility and the Marquette Branch Prison (MBP) in Marquette, Marquette County, Michigan.  Plaintiff sues Defendants Corizon, Nurse Gabriel Gluesing, Nurse Joe Wixtrom, Doctor Keith Papendick, Health Unit Manager Charles Scott, Nurse Harbaugh, Michigan Department of Corrections, Supervisor Nurse Brenda James, Prisoner Counselor Unknown Laitinen, Doctor Stacy Sylvie, Doctor George Bonefeld, Doctor Roger Gerlach, Acting Deputy Warden Unknown Minard, Resident Unit Manager Unknown Davis, and Acting Warden Unknown Christiansen.

Plaintiff alleges that on July 6, 2016, he experienced acid reflux and diarrhea. Nurse Hammonds told Plaintiff that it was the result of a change in food companies.  On September 12, 2016, Plaintiff told Defendant Gluesing that he was suffering from bloody vomit, a burning sensation throughout his gastrointestinal tract, a sore throat, sores in his mouth, flatus, weakness, and strong smelling urine.  Plaintiff showed him a deodorant lid full of vomit with blood in it. Defendant Gluesing stated that Plaintiff looked fine and began walking away.  Plaintiff then placed a sign in the camera's view stating, "Internal Bleeding, Emergent."  Defendant Gluesing stated, "show me."  Plaintiff then choked up some white acidy looking stuff that had drops of blood in it. Defendant Gluesing told Plaintiff to submit a health care request.  Plaintiff asked Defendant Gluesing to do a vital check and to send him to the hospital, but Defendant Gluesing refused, stating that he was not going to pull Plaintiff out on third shift.  Plaintiff completed a health care request.

On September 15, 2016, Nurse Practitioner Falk told Plaintiff that his sed rate was 36 mm/hh as a result of inflammation, but that Plaintiff shouldn't worry because he had seen rates much worse. Falk then told Plaintiff that he had ulcers, but that Protonix would take care of them. Plaintiff had an x-ray on September 20, 2016, which showed constipation and several pheboliths. On September 23, 2016, Defendant Wixtrom told Plaintiff that he had "one big ulcer," and that there was something wrong with Plaintiff's gall bladder and stomach. However, Defendant Wixtrom did not write this in the record. Instead, Defendant Wixtrom recorded that the Protonix was having "good results."

On February 15, 2017, an x-ray of Plaintiff's abdomen showed constipation, pheboliths, and early arthritic changes of the hip. On March 22, 2017, an x-ray of Plaintiff's abdomen showed constipation and several pheboliths in Plaintiff's pelvic area. An x-ray taken on April 10, 2017, showed that Plaintiff was suffering from constipation throughout his colon and rectal area. Defendant Papendick ordered that Plaintiff be placed on Senna to address his constipation. On April 27, 2017, Plaintiff kited healthcare stating that his stools had become watery, but that he was still having pain. On May 1, 2017, R.N. Mleiko responded to a call from Corrections Officers reporting that Plaintiff was in bad shape. Defendant Bonefeld examined Plaintiff and ordered Plaintiff to stop taking the Senna. Defendant Bonefeld then recorded Plaintiff's pain as being in the wrong location and prevented the R.N. from sending Plaintiff to the hospital. Defendant Bonefeld told Plaintiff to stop submitting healthcare requests.

On May 1, 2017, Plaintiff had midline abdominal pain, and upper right quadrant pain that Defendant Bonefeld did not document. On May 4, 2017, Plaintiff's lab results revealed elevated ALT, AST, YGT, and triglycerides, which indicate hepatobiliary dysfunction. On May 2, 2017, an x-ray showed that Plaintiff continued to have constipation throughout his colon and

rectal area. Blood work done on May 4, 2017, showed multiple abnormalities consistent with hepatobiliary dysfunction. On May 26, 2017, Nurse Practitioner Falk submitted a request for a CT scan of Plaintiff's abdomen. Falk charted that Plaintiff reported an inability to take Senna because it caused watery stools, and that Plaintiff was experiencing pain in his right and left abdomen, with tingling on his right side. Defendant Papendick denied the requested CT scan and ordered that Plaintiff continue to take Senna.

On June 6, 2017, Nurse Practitioner Falk submitted a request for an ultrasound, but Defendant Papendick denied the request, stating that there was not a demonstrable medical necessity at the time and that watery stools might be necessary to clear the constipation. On June 27, 2017, after Plaintiff had been taking Senna for an extended period of time, an x-ray showed that Plaintiff was suffering from obstipation, which is a severe form of constipation. Plaintiff claims that his medical record had been falsified on numerous occasions in order to deny Plaintiff treatment. In particular, Plaintiff states that lab results showing that his sed rate was near 0 were medically impossible, given Plaintiff's arthritis, abscessed tooth, and abnormal liver enzymes.

On July 30, 2017, Plaintiff submitted a healthcare request stating that his stool was paste like and had blood in it. Plaintiff asked for a CT scan, pain medication, and to see a gastroenterologist. Plaintiff complained of liver pain. On August 1, 2017, Plaintiff complained of blood in stool to R.N. Kristy. A couple of days later, Plaintiff had a positive test for fecal occult blood. Plaintiff was placed on Medicaid. Plaintiff states that a prisoner is only placed on Medicaid when he is about to go home or when he has a chronic condition. Plaintiff states that he is 12 years from his release date, but that he has not been officially diagnosed by Defendants.

On September 25, 2017, Plaintiff had a colonoscopy, which did not pinpoint the source of the bleeding. The doctor concluded that based on Plaintiff's symptoms and family

history, he should have an EGD test. On September 26, 2017, Plaintiff was ordered to take 4 Senna per day. On September 27, 2017, Plaintiff told Defendant James that she was supposed to request an EGD. Defendant James responded, "Yeah see if Corizon approves that." On October 25, 2017, Nurse Practitioner Falk requested an ultrasound on Plaintiff's behalf. This request was denied by Defendant Sylvie. On November 7, 2017, an x-ray showed constipation throughout Plaintiff's colon and rectal area.

On January 8-9, 2018, Nurse Practitioner Falk ordered lab tests to be sent to the hospital as a result of Plaintiff's concerns regarding the reliability of Corizon labs. Plaintiff states that the results show that the majority of his liver enzymes are abnormal and show that Plaintiff suffers from serious hepatobiliary dysfunction. On January 11, 2018, Defendant Wixtrom refused to do a full vital check or to send Plaintiff to the hospital despite the worsening of his symptoms. On January 16, 2018, an x-ray revealed continued constipation.

On January 28, 2018, Dr. Bohjanen told Plaintiff that his lab results were the result of his lactose intolerance. Plaintiff explained that he no longer had reflux and that milk did not cause him any problems. On January 31, 2018, Defendant Gluesing attempted to send Plaintiff to the hospital, but Dr. Bohjanen refused, stating that Plaintiff was lactose intolerant. On February 2, 2018, Plaintiff's LDH isoenzymes 1 and 5 were abnormally high, but these results were later removed from Plaintiff's record. On February 12, 2018, Defendant Scott deflected Plaintiff's complaints by placing blame on Corizon and the cost of care. Defendant Scott told Plaintiff that his labs did not warrant further examination and told him that a sed rate of 0 was clinically possible for someone with Plaintiff's abnormalities.

On March 8, 2018, Plaintiff received detailed information regarding the medication Senna, stating:

> Senna is not recommended when abdominal pain, nausea, or vomiting or sudden change of bowel habits are present. Long term administration of Senna is not recommended for the treatment of chronic constipation. "Rectal bleeding" or failure to have a bowel movement after Senna use may indicate a serious underlying gastrointestinal condition and warrants discontinuation of therapy and evaluation.

(ECF No. 25, PageID.338, ¶ 42.) Plaintiff immediately stopped taking the Senna and submitted a request to be evaluated for gastrointestinal damage.

On March 22, 2018, a specialist named Lewis evaluated Plaintiff and told him that if he was not in prison, he would have already had an ultrasound, a EGD, and a CT scan. Lewis then submitted a request for an ultrasound, which was denied by Defendant Papendick, who also ordered that Plaintiff be placed on the maximum dose for Senna. Nursing staff told Plaintiff that several prisoners have been on Senna for chronic constipation for 2 years or more.

On April 30, 2018, an ultrasound was conducted by Christina Arnoldus. In the report, Arnoldus stated that the black box restraints on Plaintiff and the gas in his abdomen were complicating factors in obtaining a clear ultrasound. The ultrasound revealed a small nodule mass that was suggestive of a small gall bladder wall polyp. Plaintiff states that recognized medical experts state that a patient with a gall bladder polyp and persistent biliary symptoms should undergo a cholecystectomy, or removal of the gall bladder. Plaintiff discussed his symptoms and history with a doctor named Verbridge, who recommended that Plaintiff see a gastroenterologist if his pain and symptoms persisted. Plaintiff's "ALT" was nearly double the upper limit of normal.

On May 1, 2018, Defendant Bonefeld charted that he did a physical examination, but only checked Plaintiff's blood pressure, oxygen level, weight, and temperature. Defendant Bonefeld failed to document that a polyp was located on the wall of Plaintiff's gall bladder. Defendant Bonefeld falsely charted that Plaintiff's LDH levels were normal on April 6, 2018, and then lost the actual test results. Defendant Bonefeld charted "no dx [diagnosis] found" and blamed the elevation in Plaintiff's ALT on his statin medication. On May 3, 2018, Plaintiff asked to be

6

placed on observation status due to feelings of loss and pain.

On May 4, 2018, Defendant Gerlach conducted a cursory examination in a room with eight corrections officers and no privacy. Defendant Gerlach also conducted a chart review and diagnosed Plaintiff with chronic constipation and slight drug induced liver intoxication caused by Lipitor. Plaintiff requested treatment for his gall bladder, a liver biopsy, and an EGD due to his family history of small bowel cancer, sores in his mouth, and x-ray results. Plaintiff also told Defendant Gerlach about his difficulties with Senna. After his exam, Defendant Gerlach ordered that Plaintiff's treatment for hyperlipidemia be discontinued and that he be placed back on Senna.

On May 30, 2018, Plaintiff received a hepatitis screen result from March 27, 2018, showing that Plaintiff had tested positive for Hepatitis B. Plaintiff states that such a test signifies either the end of the acute infection phase of Hepatitis B or immunity as a result of the Hepatitis B vaccine. Plaintiff states that he was never vaccinated, but that Defendants claimed he was vaccinated in 1999. Defendants continued to tell Plaintiff that his symptoms were the result of constipation, Lipitor, and lactose intolerance. Defendant Harbaugh has continually denied all of Plaintiff's medical grievances, affidavits, and pleas for adequate health services.

Plaintiff claims that he has been improperly charged medical co-payments in violation of the Due Process Clause of the Fourteenth Amendment because he was charged $55.00 for services that did not provide him with a diagnosis or appropriate treatment in violation of MDOC policy. The removal of funds from Plaintiff's account was authorized by Defendants James, Scott, and Laitinen.

Plaintiff states that on May 15, 2018, Defendants Christiansen, Minard, and Davis had Plaintiff moved from administrative segregation to a detention cell that had human feces on the ceiling, walls, and floor, and that there was blood on the mattress. Plaintiff was told that he

was in a wing for "problem inmates." Plaintiff claims that this move followed his request for grievance forms, for a writing surface in his cell, and for his grievances to be processed. Therefore, Plaintiff asserts that the move was retaliatory. Plaintiff's request for cleaning supplies was denied, so he cleaned the cell with a bar of hand soap and a wash cloth. Plaintiff then filed a grievance. On May 24, 2018, Defendant Davis stated that Plaintiff liked to write a lot and that he should enjoy his cell. Plaintiff spent three weeks in the cell and was never given any cleaning supplies. Plaintiff subsequently requested a hepatitis screen and an HIV test because of the condition of the cell, but his requests were denied. On June 4, 2018, Plaintiff was moved to an administrative segregation cell. On July 17, 2018, Plaintiff was placed on modified access to the grievance procedure.

Plaintiff claims that Defendants violated his rights under the First, Eighth, and Fourteenth Amendments. Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.

## II. Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

        To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

        Plaintiff may not maintain a §1983 action against the Michigan Department of Corrections.  Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1993).  Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court.  *Abick*

*v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous unpublished opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from suit under the Eleventh Amendment. *See*, *e.g.*, *McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. 2010); *Turnboe v. Stegall*, No. 00-1182, 2000 WL1679478, at *2 (6th Cir. Nov. 1, 2000). In addition, the State of Michigan (acting through the Michigan Department of Corrections) is not a "person" who may be sued under §1983 for money damages. *See Lapides v. Bd. of Regents*, 535 U.S. 613 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)). Therefore, the Court dismisses the Michigan Department of Corrections.

Plaintiff claims that Defendants Scott, James, and Laitinen violated his Fourteenth Amendment due process rights by authorizing the removal of funds from Plaintiff's prison account for medical co-pays in violation of MDOC policy because Plaintiff's appointments did not result in a diagnosis or appropriate treatment. The elements of a procedural due process claim are: (1) a life, liberty, or property interest requiring protection under the Due Process Clause, (2) a deprivation of that interest, and (3) without adequate process. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). "Without a protected liberty or property interest, there can be no federal procedural due process claim." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)).

The Court notes that it is constitutional to charge inmates a small fee for health care where indigent inmates are guaranteed service regardless of ability to pay. *Reynolds v. Wagner*, 128 F.3d 166, 173-74 (3d Cir.1997). According to MDOC Policy Directive 03.04.101, "a prisoner in a Correctional Facilities Administration (CFA) institution shall be offered necessary health care services (i.e., medical, dental, and optometric services) regardless of ability to pay, but shall be charged a fee for health care services which are requested by the prisoner as set forth in this policy."

Plaintiff does not claim that he was not seen by medical professionals during the appointments, but merely asserts that he was not satisfied with the services provided. Plaintiff was not denied medical care because of the fee, and thus did not state a due process claim. *White v. Corr. Med. Servs. Inc.*, 94 F. App'x 262, 264 (6th Cir. 2004).

Plaintiff also claims that Defendants Scott, James, and Laitinen violated his Eighth Amendment rights by using co-pays to discourage Plaintiff from seeking medical treatment. The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). The Court notes that the imposition of a co-pay for medical services without the denial of medical care does not violate the Eighth Amendment.

Plaintiff claims that Defendants Corizon, Gluesing, Wixtrom, Papendick, Harbaugh, Sylvie, Bonefeld, and Gerlach violated his Eighth Amendment rights by denying him necessary tests and treatment despite the recommendations of other health professionals. A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cty.*, 390 F.3d

890, 899 (6th Cir. 2004). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted)

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The Court concludes that Plaintiff's Eighth Amendment claims against Defendants Corizon, Gluesing, Wixtrom, Papendick, Harbaugh, Sylvie, Bonefeld, and Gerlach are not clearly frivolous and may not be dismissed on initial review.

Plaintiff also alleges that Defendants Minard, Davis, and Christiansen retaliated against him for filing grievances by having him placed in a detention smell that was filthy with feces. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise

of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). The Court concludes that Plaintiff's retaliation claims against Defendants Minard, Davis, and Christiansen are not clearly frivolous and may not be dismissed on initial review.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Scott, Michigan Department of Corrections, James, and Laitinen will be dismissed for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. §§ 1915(e) and 1915A, and 42 U.S.C. § 1997e(c). The Court will serve the complaint against Defendants Corizon, Gluesing, Wixtrom, Papendick, Harbaugh, Sylvie, Bonefeld, Gerlach, Minard, Davis, and Christiansen.

An order consistent with this opinion will be entered.


Dated:    September 19, 2018               /s/ Paul L. Maloney
                                           Paul L. Maloney
                                           United States District Judge