UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DANIEL COOK #290601,     Case No. 2:18-cv-25

    Plaintiff,     Hon. Paul L. Maloney
            U.S. District Judge

 v.

CORIZON Health, Inc., et al.,

    Defendants.

_____/

## **REPORT AND RECOMMENDATION**

### **Introduction**

This is a civil rights action brought by state prisoner Daniel Cook pursuant to 42 U.S.C. § 1983.  Plaintiff filed his initial complaint on February 28, 2018, and his amended complaint on August 21, 2018.  Plaintiff alleges that Defendants Corizon Health, Inc., Nurse Gabriel Gluesing, Nurse Joe Wixtrom, Doctor Keith Papendick, Nurse Richard Harbaugh, Doctor Sylvie Stacy, Doctor George Bonefeld, Doctor Roger Gerlach, Deputy Warden Gary Miniard, Resident Unit Manager Davis, and Warden John Christiansen failed to provide him with appropriate medical care while he was confined at the Marquette Branch Prison (MBP) and the Ionia Correctional Facility (ICF), in violation of the 8th Amendment to the U.S. Constitution, and/or retaliated against him for complaining about this, in violation of the 1st Amendment to U.S. Constitution.[1]

_____

[1] Plaintiff also initially alleged violations of the 14th Amendment.  Those allegations were subsequently dismissed. (ECF No. 28, PageID.438.)

This Report and Recommendation addresses the following motions:

(1) a motion for summary judgment, filed by Defendants Gluesing, Wixtrom, Harbaugh, Miniard, Davis and Christiansen, asserting that Plaintiff failed to exhaust his available administrative remedies. (ECF No. 66.)

(2) a motion for summary judgment, filed by Defendants Corizon Health, Inc., Papendick, Bonefeld, Stacy and Gerlach, asserting that Plaintiff's claim that Defendants were deliberately indifferent to his serious medical needs fails to establish a genuine issue of material fact, and a related motion, filed by Defendant Gerlach, asserting that Plaintiff failed to exhaust his available administrative remedies. (ECF No. 122.)

(3) Plaintiff's motion for a preliminary injunction. (ECF No. 69.)

(4) Plaintiff's motion for a temporary restraining order and preliminary injunction. (ECF No. 77.)

(5) Plaintiff's motion for a temporary restraining order and preliminary injunction.[2] (ECF No. 98.)

The undersigned respectfully recommends that all of Defendants' motions for summary judgment be granted. If these recommendations are adopted, all of

---

[2] Plaintiff also filed a motion to join his first motion for a preliminary injunction (ECF No. 69) to the motion for preliminary injunction and temporary restraining order (TRO) he filed on Jan. 25, 2019. (ECF No. 97.)

Plaintiff's claims will be eliminated and his case should be dismissed.[3]  If any of Plaintiff's claims remain, then the undersigned respectfully recommends that Plaintiff's motions for TROs and preliminary injunctions be denied.

## Plaintiff's Allegations

This Court previously summarized Plaintiff's factual allegations in its Opinion dated Sept. 19, 2018.  (*See* ECF No. 28, Opinion, at PageID.429-435).)  This summary is repeated, with a few minor modifications, below.

Plaintiff alleges that, on July 6, 2016, he experienced acid reflux and diarrhea. Nurse Hammonds told Plaintiff that it was the result of a change in food companies. On September 12, 2016, Plaintiff told Defendant Gluesing that he was suffering from bloody vomit, a burning sensation throughout his gastrointestinal tract, a sore throat, sores in his mouth, flatus, weakness, and strong-smelling urine.  Plaintiff showed him a deodorant lid full of vomit with blood in it.  Defendant Gluesing stated that Plaintiff looked fine and began walking away.  Plaintiff then placed a sign in the camera's view stating, "Internal Bleeding, Emergent."  Defendant Gluesing stated, "show me."  Plaintiff then choked up some "white acidy" looking "stuff" that had "drops of blood in it."  Defendant Gluesing told Plaintiff to submit a health care request.  Plaintiff asked Defendant Gluesing to do a vital check and to send him to

---

[3]    Defendants did not move for summary judgment on Plaintiff's 1st Amendment retaliation claim.  This Court previously ruled that Plaintiff's 1st Amendment claims against Defendants Miniard, Davis and Christiansen would not be dismissed on initial review.  (ECF No. 28, PageID.440.)  If the Court grants Defendants' motion for summary judgment for failure to exhaust administrative remedies, then the three Defendants still subject to Plaintiff's 1st Amendment retaliation claims would be dismissed form the case.

the hospital, but Defendant Gluesing refused, stating that he was not going to pull Plaintiff out on third shift.  Plaintiff completed a health care request.

On September 15, 2016, Nurse Practitioner Falk told Plaintiff that his sedimentation rate (or "sed" rate) was 36 mm/hh as a result of inflammation, but that Plaintiff shouldn't worry because he had seen rates much worse.  Falk then told Plaintiff that he had ulcers, but that Protonix would take care of them.  Plaintiff had an x-ray on September 20, 2016, which showed constipation and several phleboliths.

On September 23, 2016, Defendant Wixtrom told Plaintiff that he had "one big ulcer," and that there was something wrong with Plaintiff's gall bladder and stomach.  However, Defendant Wixtrom did not write this in the medical record.  Instead, Defendant Wixtrom recorded that the Protonix was having "good results."

On February 15, 2017, an x-ray of Plaintiff's abdomen showed constipation, phleboliths, and early arthritic changes of the hip.  On March 22, 2017, an x-ray of Plaintiff's abdomen showed constipation and several phleboliths in Plaintiff's pelvic area.  An x-ray taken on April 10, 2017, showed that Plaintiff was suffering from constipation throughout his colon and rectal area.

Defendant Papendick ordered that Plaintiff be placed on Senna (a laxative) to address his constipation.

On April 27, 2017, Plaintiff kited healthcare stating that his stools had become watery, but that he was still having pain.

On May 1, 2017, R.N. Mleiko responded to a call from corrections officers reporting that Plaintiff was in bad shape.  Defendant Bonefeld examined Plaintiff

and ordered Plaintiff to stop taking the Senna.  Defendant Bonefeld then recorded Plaintiff's pain as being in the wrong location and prevented the R.N. from sending Plaintiff to the hospital.  Defendant Bonefeld told Plaintiff to stop submitting healthcare requests.

On May 1, 2017, Plaintiff had midline abdominal pain, and upper right quadrant pain that Defendant Bonefeld did not document.  On May 4, 2017, Plaintiff's lab results revealed elevated ALT, AST, YGT, and triglycerides, which indicate hepatobiliary dysfunction.  On May 2, 2017, an x-ray showed that Plaintiff continued to have constipation throughout his colon and rectal area.  Blood work done on May 4, 2017, showed multiple abnormalities consistent with hepatobiliary dysfunction.

On May 26, 2017, Nurse Practitioner Falk submitted a request for a CT scan of Plaintiff's abdomen.  Falk charted that Plaintiff reported an inability to take Senna because it caused watery stools, and that Plaintiff was experiencing pain in his right and left abdomen, with tingling on his right side.  Defendant Papendick denied the requested CT scan and ordered that Plaintiff continue to take Senna.

On June 6, 2017, Nurse Practitioner Falk submitted a request for an ultrasound, but Defendant Papendick denied the request, stating that there was not a demonstrable medical necessity at the time and that watery stools might be necessary to clear the constipation.  On June 27, 2017, after Plaintiff had been taking Senna for an extended period of time, an x-ray showed that Plaintiff was suffering from obstipation, which is a severe form of constipation.  Plaintiff claims that his medical record had been falsified on numerous occasions in order to deny him

5

treatment.  In particular, Plaintiff states that lab results showing that his sed rate was near 0 were medically impossible, given his arthritis, abscessed tooth, and abnormal liver enzymes.

On July 30, 2017, Plaintiff submitted a healthcare request stating that his stool was "paste-like" and had blood in it.  Plaintiff asked for a CT scan, pain medication, and to see a gastroenterologist.  Plaintiff complained of liver pain.  On August 1, 2017, Plaintiff complained of blood in his stool to R.N. Kristy.  A couple of days later, Plaintiff had a positive test for fecal occult blood.  Plaintiff was placed on Medicaid.  Plaintiff states that a prisoner is only placed on Medicaid when he is about to go home or when he has a chronic condition.  Plaintiff states that he is 12 years from his release date, but that he has not been officially diagnosed by Defendants.

On September 25, 2017, Plaintiff had a colonoscopy, which did not pinpoint the source of the bleeding.  The doctor concluded that based on Plaintiff's symptoms and family history, he should have an EGD test.  On September 26, 2017, Plaintiff was ordered to take four Senna per day.  On September 27, 2017, Plaintiff told nurse Brenda James that she was supposed to request an EGD.  Nurse James responded, "Yeah see if Corizon approves that."  On October 25, 2017, Nurse Practitioner Falk requested an ultrasound on Plaintiff's behalf.  This request was denied by Defendant Stacy.  On November 7, 2017, an x-ray showed constipation throughout Plaintiff's colon and rectal area.

On January 8-9, 2018, Nurse Practitioner Falk ordered lab tests to be sent to the hospital as a result of Plaintiff's concerns regarding the reliability of Corizon labs.

Plaintiff states that the results show that the majority of his liver enzymes are abnormal and show that Plaintiff suffers from serious hepatobiliary dysfunction.  On January 11, 2018, Defendant Wixtrom refused to do a full vital check or to send Plaintiff to the hospital despite the worsening of his symptoms.  On January 16, 2018, an x-ray revealed continued constipation.

On January 28, 2018, Dr. Bohjanen told Plaintiff that his lab results were the result of his lactose intolerance.  Plaintiff explained that he no longer had reflux and that milk did not cause him any problems.  On January 31, 2018, Defendant Gluesing attempted to send Plaintiff to the hospital, but Dr. Bohjanen refused, stating that Plaintiff was lactose intolerant.  On February 2, 2018, Plaintiff's LDH isoenzymes 1 and 5 were abnormally high, but these results were later removed from Plaintiff's record.  On February 12, 2018, Nurse Charles Scott deflected Plaintiff's complaints by placing blame on Corizon and the cost of care.  Nurse Scott told Plaintiff that his labs did not warrant further examination and told him that a sed rate of 0 was clinically possible for someone with Plaintiff's abnormalities.

On March 8, 2018, Plaintiff received detailed information regarding the medication Senna, stating:

> Senna is not recommended when abdominal pain, nausea, or vomiting or sudden change of bowel habits are present.  Long term administration of Senna is not recommended for the treatment of chronic constipation.  "Rectal bleeding" or failure to have a bowel movement after Senna use may indicate a serious underlying gastrointestinal condition and warrants discontinuation of therapy and evaluation.

(ECF No. 25, PageID.338, ¶ 42.)  Plaintiff immediately stopped taking the Senna and submitted a request to be evaluated for gastrointestinal damage.

On March 22, 2018, a specialist named Lewis evaluated Plaintiff and told him that if he was not in prison, he would have already had an ultrasound, an EGD, and a CT scan. Lewis then submitted a request for an ultrasound, which was denied by Defendant Papendick, who also ordered that Plaintiff be placed on the maximum dose for Senna. Nursing staff told Plaintiff that several prisoners have been taking Senna for chronic constipation for two years or more.

On April 30, 2018, an ultrasound was conducted by Christina Arnoldus. In the report, Arnoldus stated that the black box restraints on Plaintiff and the gas in his abdomen were complicating factors in obtaining a clear ultrasound. The ultrasound revealed a small nodule mass that was suggestive of a small gall bladder wall polyp. Plaintiff states that recognized medical experts state that a patient with a gall bladder polyp and persistent biliary symptoms should undergo a cholecystectomy, or removal of the gall bladder. Plaintiff discussed his symptoms and history with Dr. Verbridge, who recommended that Plaintiff see a gastroenterologist if his pain and symptoms persisted. Plaintiff's ALT was nearly double the upper limit of normal.

On May 1, 2018, Defendant Bonefeld charted that he did a physical examination, but only checked Plaintiff's blood pressure, oxygen level, weight, and temperature. Defendant Bonefeld failed to document that a polyp was located on the wall of Plaintiff's gall bladder. Defendant Bonefeld falsely charted that Plaintiff's LDH levels were normal on April 6, 2018, and then lost the actual test results. Defendant Bonefeld charted "no dx [diagnosis] found" and blamed the elevation in Plaintiff's ALT on his statin medication. On May 3, 2018, Plaintiff asked to be placed

on observation status due to feelings of loss and pain.

On May 4, 2018, Defendant Gerlach conducted a cursory examination in a room with eight corrections officers and no privacy.  Defendant Gerlach also conducted a chart review and diagnosed Plaintiff with chronic constipation and slight drug induced liver intoxication caused by Lipitor.  Plaintiff requested treatment for his gall bladder, a liver biopsy, and an EGD due to his family history of small bowel cancer and mouth sores.  Plaintiff also told Defendant Gerlach about his difficulties with Senna.  After his exam, Defendant Gerlach ordered that Plaintiff's treatment for hyperlipidemia be discontinued and that he be placed back on Senna.

On May 30, 2018, Plaintiff received a hepatitis screen result from March 27, 2018, showing that Plaintiff had tested positive for Hepatitis B.  Plaintiff states that such a test signifies either the end of the acute infection phase of Hepatitis B or immunity as a result of the Hepatitis B vaccine.  Plaintiff states that he was never vaccinated, but that Defendants claimed he was vaccinated in 1999.  Defendants continued to tell Plaintiff that his symptoms were the result of constipation, Lipitor, and lactose intolerance.  Defendant Harbaugh has continually denied all of Plaintiff's medical grievances, affidavits, and pleas for adequate health services.

Plaintiff states that on May 15, 2018, Defendants Christiansen, Miniard, and Davis had Plaintiff moved from administrative segregation to a detention cell that had human feces on the ceiling, walls, and floor, and that there was blood on the mattress.  Plaintiff was told that he was in a wing for "problem inmates."  Plaintiff claims that this move followed his request for grievance forms, for a writing surface

9

in his cell, and for his grievances to be processed. Therefore, Plaintiff asserts that the move was retaliatory. Plaintiff's request for cleaning supplies was denied, so he cleaned the cell with a bar of hand soap and a wash cloth. Plaintiff then filed a grievance. On May 24, 2018, Defendant Davis stated that Plaintiff liked to write a lot and that he should enjoy his cell. Plaintiff spent three weeks in the cell and was never given any cleaning supplies. Plaintiff subsequently requested a hepatitis screen and an HIV test because of the condition of the cell, but his requests were denied. On June 4, 2018, Plaintiff was moved to an administrative segregation cell. On July 17, 2018, Plaintiff was placed on modified access to the grievance procedure.

After initial review of the complaint, Plaintiff's remaining claims are that Defendants Miniard, Davis, and Christiansen retaliated against him in violation of his 1st Amendment rights, and that Defendants Corizon Health, Gluesing, Wixtrom, Papendick, Harbaugh, Stacy, Bonefeld, and Gerlach denied him medical care in violation of his 8th Amendment rights. (ECF No. 28, PageID.439-440.) Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.[4]

## Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005); *Thomas v. City of Chattanooga*, 398 F.3d

---

[4] Plaintiff's 14th Amendment due process claim regarding improperly charged co-payments was dismissed. (ECF No. 28, PageID.437-38.)

426, 429 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *Tucker v. Union of Needletrades Indus. & Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

## Exhaustion of Administrative Remedies

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 549 U.S. 199, 212-16 (2007). A moving party without the burden of proof need show only that the opponent cannot sustain his burden at trial. *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). A moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d

254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)).  The Sixth Circuit repeatedly has emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, et al., *MOORES FEDERAL PRACTICE* § 56.13[1], at 56-138 (3d ed. 2000)); *Cockrel*, 270 F.2d at 1056.  Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001).  A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process.  *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999).  In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules.  *Jones*, 549 U.S. at 218-19; *Woodford v. Ngo*, 548 U.S. 81, 90-91

(2006).   "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'"   *Jones*, 549 U.S. at 218-19.   In rare circumstances, the grievance process will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."   *Ross v. Blake*, 578 U.S. ___, 136 S.Ct. 1850, 1859-60 (2016).

Michigan Dept. of Corrections (MDOC) Policy Directive 03.02.130 (effective on July 9, 2007, superseded on March 18, 2019), sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control.   *Id.* at ¶ P.   If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution.   *Id.* at ¶¶ P, V.   The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ V.   The Policy Directive also provides the following directions for completing grievance forms: "The issues should be stated briefly but concisely.   Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).   Dates, times, places and names of all those involved in the issue being grieved are to be included."   *Id.* at ¶ R (emphasis in original).   When prison

officials waive enforcement of these procedural rules and instead consider a non-exhausted claim on its merits, a prisoner's failure to comply with those rules will not bar that prisoner's subsequent federal lawsuit.  *Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010).  The Sixth Circuit has explained:

> [A] prisoner ordinarily does not comply with MDOCPD 130—and therefore does not exhaust his administrative remedies under the PLRA—when he does not specify the names of each person from whom he seeks relief.  *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 324-25 (6th Cir. 2010) ("Requiring inmates to exhaust prison remedies in the manner the State provides—by, say, identifying *all* relevant defendants—not only furthers [the PLRA's] objectives, but it also prevents inmates from undermining these goals by intentionally defaulting their claims at each step of the grievance process, prompting unnecessary and wasteful federal litigation process.").  An exception to this rule is that prison officials waive any procedural irregularities in a grievance when they nonetheless address the grievance on the merits.  *See id.* at 325.   We have also explained that the purpose of the PLRA's exhaustion requirement "is to allow prison officials 'a fair opportunity' to address grievances on the merits to correct prison errors that can and should be corrected to create an administrative record for those disputes that eventually end up in court."  *Id.* at 324.

*Mattox v. Edelman*, 851 F.3d 583, 590-91 (6th Cir. 2017).[5]

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due.  MDOC Policy Directive 03.02.130 at ¶¶ T, BB.  The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for a

---

[5] In *Mattox*, the Sixth Circuit held that a prisoner may only exhaust a claim "where he notifies the relevant prison . . . staff" regarding the specific factual claim "giving the prison staff a fair chance to remedy a prisoner's complaints."  *Id.* at 596.  For example, grieving a doctor about his failure to give cardiac catheterization failed to grieve the claim that the doctor erred by not prescribing Ranexa.

medical care grievances.  *Id.* at ¶ DD.  If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form.  *Id.* at ¶¶ T, FF.  The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due.  *Id.* at ¶¶ T, FF.  The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director.  *Id.* at ¶ GG.  "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved."  *Id.* at ¶ S.

In addition, the grievance policy provides that, where the grievance alleges conduct that falls under the jurisdiction of the Internal Affairs Division pursuant to Policy Directive 01.01.140, the prisoner may file his Step I grievance directly with the inspector of the institution in which the prisoner is housed, instead of with the grievance coordinator, as set forth in ¶ V of Policy Directive 03.02.130.  *Id.* at ¶ Q.  In such instances, the grievance must be filed within the time limits prescribed for filing grievances at Step I.  *Id.*  Regardless of whether the grievance is filed with grievance coordinator or the inspector, the grievance will be referred to the Internal Affairs Division for review and will be investigated in accordance with MDOC Policy Directive 01.01.140.  The prisoner will be promptly notified that an extension of time is needed to investigate the grievance.  *Id.*

Defendants Gluesing, Wixtrom, Harbaugh, Miniard, Davis, Christiansen, and Gerlach argue that Plaintiff failed to properly exhaust his grievance remedies against them because he failed to comply with the grievance procedure described above. Defendants have identified five grievances that appear to be relevant to one or more of the claims against them.  These grievances are:

- ICF 18-06-0908-28C, which states complaints against Defendant Gerlach only,

- ICF 18-05-0688-28B, which states complaints against Defendant Gerlach only,

- MBP 1612-02-488-12D1, which states complaints against RN Patricia Lamb only,

- MBP 2017-07-1134-12E3, which states complaints against Defendants Gluesing and Wixtrom only, and

- MBP 1705-00785-12D3, which states complaints against Defendant Bonefeld only.

Plaintiff has not responded to Defendants' motions for summary judgment, but did include, as an attachment to his initial complaint, a list of grievances he filed relating to his claims.  (ECF No. 1-1, PageID.23.)  This attachment appeared to list the three grievances with MBP prefixes identified above.[6]  In his amended complaint,

---

[6]    Plaintiff included some of the grievance documents, but not all of them. Defendants also failed to provide the Court with a complete and organized collection of relevant grievance documents.

Plaintiff simply stated that he had exhausted all administrative remedies in relation to all Defendants.  (ECF No. 25, PageID.332.)

The undersigned will view the five grievances listed above as the only grievances relevant to Defendants' motions for summary judgment based on Plaintiff's failure to exhaust his administrative remedies.  A review of the documents submitted by the parties demonstrates that Plaintiff has failed to exhaust his administrative remedies (1) because he filed grievances that were rejected, (2) because he filed appeals from administrative decisions on his grievances that were untimely, and (3) because he failed to allege complaints against the Defendants named in this lawsuit.

**First**, the MDOC Prisoner Step III Grievance Report shows that the two grievances with ICF prefixes listed above – which appear to relate to Defendant Gerlach only – were rejected.  (ECF No. 67-2, PageID.805.)  ICF 18-06-0908-28C was rejected for raising multiple issues (ECF No. 122-7, PageID.1617-1627) and ICF 18-05-0688-28B was rejected.[7]  (MDOC Prisoner Step III Grievance Report, ECF No. 122-7, PageID.1596-1597 and ECF No. 67-2, PageID.805-806.)  Accordingly, these grievances are not properly exhausted.[8]  As mentioned above, in order to properly

---

[7] A copy of ICF 18-05-0668-28B is not in the record.

[8] Defendants Gluesing, Wixtrom, Harbaugh, Miniard, Davis, and Christiansen attached some of the grievances to their motion for summary judgment in Exhibit A. (ECF No. 77-2, PageID.812-899.)  Grievance MBP 1612-02-488-12D1 is located at PageID.881-886; grievance MBP 2017-07-1134-12E3 is located at PageID.856-860; and grievance MBP 1705-00785-12D3 is located at PageID.871-875.  When Plaintiff filed his initial complaint, he listed grievances that he asserted exhausted his claims. (ECF No. 1, PageID.23.)  Plaintiff did not list grievance ICF 1806-908-28C or

exhaust administrative remedies, a prisoner must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones*, 549 U.S. at 218-19. The records associated with the ICF-numbered grievances demonstrate that Plaintiff failed to comply with the applicable procedural rules.

**Second**, in MBP 1612-02-488-12D1, Plaintiff alleged that, on December 2, 2016, he was seen by medical staff for ongoing internal digestive problems. Plaintiff asserted that doctors claimed that he was constipated, but he was in pain and believed that "someone at this facility has caused" him harm by placing something in his food. (PageID.884.) The Step I response states that Plaintiff was examined by a nurse and referred to a medical provider, but failed to attend his appointment. (PageID.885.) At Step III, Plaintiff states that Patricia Lamb, RN, lied and provided false information, and that Nurse Gabe failed to check his vitals. (PageID.882, 886.) Plaintiff failed to assert a relevant claim against any of the named Defendants in MBP 1612-02-488-12D1. The MDOC requires a prisoner to identify the individuals being grieved, *Reed-Bey*, 603 F.3d at 324-25, and the subject matter of the grievance. *Mattox*, 851 F.3d at 596. Plaintiff must name each defendant in a properly exhausted grievance before he files a federal complaint. *Kean v. Hughes*, No. 1:12-cv-847, 2013 WL 5771146 at *2 (W.D. Mich. Oct. 24, 2013) ("The MDOC had no reason to address a claim against any other employee"). Thus, this grievance does not establish that

---

grievance ICF 1805-688-28B as grievances that exhausted his claims because those grievances arose after Plaintiff filed his initial complaint.

Plaintiff exhausted his administrative remedies relating to his claims against any of the named Defendants.

**Third**, in MBP 2017-07-1134-12E3, Plaintiff asserted that Defendant Gluesing submitted falsified information numerous times in his health care records to cover-up the fact that he ignored Plaintiff's symptoms on September 13, 2016, which caused "severe damage" to Plaintiff's digestive track. (PageID.859.)  The Step I grievance response stated that Defendant Gluesing was called to Plaintiff's cell to assess food poisoning concerns.  Defendant Gluesing determined that Plaintiff did not require emergent care and informed Plaintiff to contact health care if his condition worsened.  He referred Plaintiff for a mental health assessment.  Plaintiff was examined by a nurse later that morning and his exam was normal.  (PageID.860.)  Plaintiff' Step II grievance indicates that Defendant Wixtrom told him that he had ulcers.  (PageID.857.)   Plaintiff's Step II grievance was denied.  (PageID.858.)  Plaintiff's Step III grievance was then rejected as untimely.[9]  (PageID.856.)  Plaintiff failed to properly exhaust his grievance against Defendant Gluesing due to his failure to timely submit his Step III grievance.  For the same reason, this grievance did not properly exhaust a claim against Defendant Wixtrom.

**Fourth**, in MBP 1705-00785-12D, Plaintiff alleged that Defendant Bonefeld failed to follow-up on his digestive tract symptoms.  Instead, Plaintiff alleges that his

---

[9] Plaintiff states that he timely mailed his Step III grievance on September 5, 2017. (PageID.346.)   This assertion contradicts the September 6, 2017, allegation in his Step III grievance.  (ECF No. 67-2, PageID.857.)

exam was rushed and appeared to be a cover-up.  (PageID.872.)  Plaintiff potentially exhausted his administrative remedies with regard to Defendant Bonefeld.  But Defendant Bonefeld was not one of the Defendants who filed a motion for summary judgment based on failure to exhaust administrative remedies.

In summary, Plaintiff's grievances failed to allege any complaints against Defendants Harbaugh, Miniard, Davis or Christiansen.  Accordingly, Plaintiff has failed to exhaust his administrative remedies with regard to these Defendants. Furthermore, Plaintiff's grievances against Defendants Gerlach, Gluesing and Wixtrom were flawed and did not exhaust his remedies against these Defendants.

For these reasons, the undersigned respectfully recommends that the Court dismiss Defendants Gerlach, Gluesing, Wixtrom, Harbough, Miniard, Davis, and Christiansen due to Plaintiff's failure to properly exhaust administrative remedies with respect to his claims against them.

### Eighth Amendment Deliberate Indifference

Defendants Corizon Health, Inc., Papendick, Bonefeld, Stacy, and Gerlach move for summary judgment based upon the medical record establishing that Plaintiff received extensive medical care and that each Defendant was not deliberately indifferent to his serious medical needs.  Plaintiff disagrees with the medical care and treatment that he received.

The 8th Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  The 8th Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a

failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The 8th Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing

harm or with knowledge that harm will result." *Id.*  Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the 8th Amendment. *Estelle*, 429 U.S. at 105.  As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind.  Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted).  Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996).  This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  If "a prisoner has received some medical attention and the dispute is

over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

The medical records in this case establish that Plaintiff received extensive medical care in 2016, 2017 and 2018, with numerous medical examinations, x-rays and other tests. Thus, Plaintiff cannot claim that he did not receive medical care. Plaintiff simply disagrees with the medical care and diagnoses he received from numerous nurses, nurse practitioners and doctors who saw him in 2016, 2017 and 2018. From an objective point of view, Plaintiff has failed to place verifying medical evidence in the record to establish the detrimental effect of any delay in medical treatment he received. Furthermore, from a subjective point of view, Plaintiff has

23

failed to allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

The medical records show that Nurse Practitioner Falk, who is not a defendant here, examined Plaintiff multiple times from 2016-2018. Falk was generally Plaintiff's first point of contact with the medical system while he was in Marquette Branch Prison. Falk would conduct an examination of Plaintiff and then refer him for additional testing or examinations.

Plaintiff was examined for gastrointestinal complaints on September 15, 2016 by Nurse Practitioner Falk. (ECF No. 122-2, PageID.1354-1357.) Plaintiff complained that his symptoms were ongoing for the past three months. An x-ray showed constipation and medication was ordered for treatment. (PageID.1359-1360.) On December 16, 2016, Plaintiff was again examined by Nurse Practitioner Falk. Plaintiff complained of abdominal pain with increased problems with some foods. Plaintiff was concerned that he had cancer and requested a colonoscopy or PET scan. (PageID.1361.) Nurse Practitioner Falk ordered a fecal occult blood test, which was negative. Plaintiff was prescribed Ultram. (PageID.1362-1363.) X-rays on February 15, 2017, and on March 22, 2017, showed that Plaintiff was suffering from constipation. (PageID.1373-1374, 1381.) Plaintiff was prescribed Magnesium Citrate. (PageID.1382.) Plaintiff continued to suffer from constipation issues and was examined by Nurse Practitioner Falk on April 7, 2016. It was noted that Plaintiff was refusing medication to help remedy this condition and his symptoms were

24

aggravated by the food that he was eating.  (PageID.1387.)  Plaintiff received an x-ray on April 10, 2017, which showed constipation.  (PageID.1391.)

As of April 12, 2017, Plaintiff continued to refuse multiple doses of Magnesium Citrate, was angered by the lack of care that he was receiving, and believed that pain medication would resolve his issues.  Plaintiff did not believe that his issues were due to constipation.  (PageID.1392.)  Plaintiff expressed frustration and "wanted something done NOW." (*Id*.)  Nurse Practitioner Falk requested a Pain Management Committee (PMC) evaluation and a colonoscopy.  (PageID.1395-1400.)  Plaintiff believed that he needed a colonoscopy or a PET scan and pain medications.  (PageID.1400.)  Plaintiff was taking the medications Zantac, Constulose, and Atorvastatin.  Plaintiff refused doses of Magnesium Citrate and Lactulose because he disagreed with the medical diagnosis.  (*Id*.)

### Doctors Papendick, Bonefeld, and Stacy's Treatment

Defendant Papendick reviewed Nurse Practitioner Falk's request for a colonoscopy on April 13, 2017.  *Id*.  Defendant Papendick determined that a colonoscopy was not medically necessary and that Plaintiff should be treated with Senna tablets twice daily.  Defendant Papendick further indicated that if treatment was refused, Plaintiff should sign a release of responsibility (ROR).  *Id*.  On May 1, 2017, Defendant Bonefeld, ordered an x-ray of Plaintiff's abdomen.  (PageID.1411.)  The x-ray showed that Plaintiff was constipated.  (PageID.1412.)

On May 10, 2017, the PMC responded to Nurse Practitioner Falk's request for pain management by encouraging Plaintiff to walk twice per day for 20-40 minutes

and denying non-formulary medication.  (PageID.1413.)  Plaintiff was examined on May 16, 2017.  Plaintiff stated that he did not believe that he was constipated and that he stopped taking Zantac.  (PageID.1414.)  Zantac was reordered and a fecal occult blood test was negative.  (PageID.1415-1418.)

Nurse Practitioner Falk examined Plaintiff on May 26, 2017.  Nurse Practitioner Falk requested a CT scan of Plaintiff's abdomen.  (PageID.1419-1423.) Plaintiff indicated that he was upset with his plan of care and that he had consistent abdominal pain during the past 9-10 months.  Plaintiff's laboratory tests were normal and x-rays showed that he was constipated.  Plaintiff was treated for constipation with Senna but could not tolerate the side effects.  (PageID.1423.)  Defendant Papendick denied the request for a CT scan as not medically necessary and further indicated that Plaintiff's abdomen should be reevaluated after the constipation is resolved by utilizing abdominal films.  (PageID.1427.)

On May 31, 2017, Nurse Practitioner Falk requested Miralax to treat Plaintiff's constipation.  (PageID.1428-1429.)  Dr. William Borgerding approved Metamucil the next day.  (PageID.1430.)  Nurse Practitioner Falk saw Plaintiff on June 6, 2017.  (PageID.1433.)  Plaintiff reported that he was having liver pain and needed to go to the hospital for a CT scan. *Id*. Nurse Practitioner Falk told Plaintiff to continue taking Metamucil and requested an ultrasound and a follow-up consultation.  *Id*.  On June 7, 2017, Defendant Papendick determined that an ultrasound was not medically necessary and that "watery stools may be necessary in order to clear constipation."  (PageID.1438.)  On June 9, 2017, Plaintiff continued to

26

complain that his liver was burning despite taking the Metamucil. Plaintiff wanted a CT scan. (PageID.1439.) Nurse Practitioner Falk ordered an x-ray of Plaintiff's abdomen. (PageID.1440.) The June 27, 2016, x-ray showed obstipation. (PageID.1443.) On August 6, 2017, Plaintiff received a positive fecal occult blood test. (PageID.1447.)

Due to the positive fecal occult blood test, Nurse Practitioner Falk referred Plaintiff for a physician examination. (PageID.1449.) Plaintiff was examined by Defendant Bonefeld on August 28, 2017. Defendant Bonefeld indicated that Plaintiff was not interested in the nature of his problem, but ranted about the failures of the MDOC and concerns about his liver. (PageID.1451.) Defendant Bonefeld requested a colonoscopy. That request was approved by Defendant Papendick. (PageID.1452-1455.) Plaintiff had a colonoscopy at the U.P. Health System in Marquette, on September 25, 2017. (PageID.1467.) The colonoscopy result was normal. *Id.* Plaintiff became angry when he learned that his colonoscopy was normal. (PageID.1469.) Plaintiff stated that he needed a CT scan and Upper GI endoscopy to check for small bowel cancer. *Id.*

Nurse Practitioner Falk examined Plaintiff on October 10, 2017, and, on October 25, 2017, after a chart review, requested an abdominal ultrasound. (PageID.1472-1476.). Defendant Stacy determined that the medical necessary criteria for an ultrasound was not present and that Plaintiff's ongoing constipation problem could be the source of his pain. Defendant Stacy recommended repeating an x-ray to ensure the constipation resolved before moving forward with other

imaging studies.  (PageID.1480.)  This was Defendant Stacy's only involvement in Plaintiff's care.

Nurse Practitioner Falk ordered another x-ray of Plaintiff's abdomen on November 2, 2017.  The November 7, 2017, x-ray revealed constipation. (PageID.1481-1484.)  A chest x-ray was normal.  (PageID.1484.)  Plaintiff continued to have gastrointestinal issues and was seen by Dr. Richard Bohjanen on November 28, 2017.  (PageID.1488-1490.)  Dr. Bohjanen noted that Plaintiff should continue with current medications and that he did not present with anything "acutely pressing at this time."  (PageID.1490.)  On January 3, 2018, Falk ordered an x-ray. (PageID.1494.)  The x-ray showed that Plaintiff was constipated.  (PageID.1498.)

Plaintiff was examined by Dr. Bohjanen on January 29, 2018.  (PageID.1501-1502.)  Plaintiff believed that the laboratory faked the results of the tests.  Dr. Bohjanen recommended lactase or milk avoidance to determine if Plaintiff was lactose intolerant.  Plaintiff became argumentative and would not listen to the recommendations.  *Id*.  Dr. Bohjanen did a chart review on February 12, 2018.  Dr. Bohjanen indicated that Plaintiff may be lactose intolerant and that paranoia was a significant contributor to his issues.  (PageID.1506.)

On March 22, 2018, Plaintiff was examined by Nurse Practitioner Patricia M. Lewis.  (PageID.1508-1512.)  Plaintiff expressed concerns regarding the long-term effects of Senna and indicated that he discontinued its use because of the side effects and due to its ineffectiveness.  Plaintiff indicated that he filed a lawsuit due to his lack of medical care.  Plaintiff stated that he needed an EGD, was lucky that he did

not have a colostomy bag, and only has "Crohns."  Plaintiff believes that he ate something that irritated his gastrointestinal tract and that it has not been right since. Nurse Practitioner Lewis felt that Plaintiff could have gall bladder disease and requested an ultrasound of Plaintiff's gallbladder.  (PageID.1510-1530.)  Defendant Papendick denied the request on March 27, 2018, as not medically necessary and recommended an increase of Senna to the maximum dose.  (PageID.1516.)  Plaintiff refused to take Senna.  (PageID.1517.)  An April 10, 2018, x-ray showed that Plaintiff had obstipation.  (PageID.1532.)

Plaintiff decided to take matters into his own hands.  On April 30, 2018, Plaintiff reported that he overdosed on "keep-on-person" medications and presented six empty medication cards to nursing staff.  (PageID.1535.)  Plaintiff was taken to the Marquette Hospital emergency department.  (PageID.1542.)  At the hospital, Plaintiff informed the medical staff that he did not take pills and that he wanted his liver and gallbladder evaluated because the medical staff at the prison were not doing anything.  *Id*.  Plaintiff stated that he has a history or abnormal liver enzymes. Examination of Plaintiff's abdomen was unremarkable.  (PageID.1543.)  A blood test and ultrasound were ordered.   Plaintiff's liver enzymes, ALT, were mildly elevated and the ultrasound was unremarkable.  On release from the hospital, Plaintiff was smiling and joking with the staff.  *Id*.

On May 1, 2018, Defendant Bonefeld noted that Plaintiff alleged he had overdosed at the prison but then denied taking pills after he was taken to the hospital. Defendant Bonefeld stopped Plaintiff's statin medication due to elevated ALT

enzymes and ordered a re-check of his enzymes in one month.  (PageID.1546.)  This was Defendant Bonefeld's last involvement with Plaintiff's medical care.

### Doctor Gerlach's Treatment

Plaintiff transferred from the MBP to the ICF on May 2, 2018.  Defendant Gerlach reviewed Plaintiff's chart on May 9, 2018 and noted that there did not appear to be a "comprehensive bowel program."  Defendant Gerlach hoped that Plaintiff would agree to a new approach to his extensively documented obstipation problem and not ask for more testing.  (PageID.1553.)  Defendant Gerlach agreed that Plaintiff's statin medication likely caused the elevation of his enzymes and his lipid issue could be monitored until his GI issue was under better control.  *Id*.

Defendant Gerlach examined Plaintiff on May 14, 2018.  Defendant Gerlach noted the irrefutable medical evidence of chronic constipation/obstipation and that Plaintiff had been either noncompliant with his medical care or unwilling to stay on a comprehensive bowel program.  (PageID.1555.)  Defendant Gerlach continued Plaintiff's current medication Protonix and ordered Colase, Senna, and Constulose. He stopped Plaintiff's Lactulose medicine.  He discussed a treatment plan for Plaintiff's constipation and reviewed diagnostic studies with Plaintiff.  Plaintiff refused Defendant Gerlach's treatment recommendations.  (PageID.1556, 1558.) Defendant Gerlach ordered a blood test, and Westergren Sedimentation Rate lab tests.  (PageID.1557.)  Defendant Gerlach's request for fiber was approved for Plaintiff.  (PageID.1559, 1561.)  A June 20, 2018, x-ray showed obstipation. (PageID.1569.)  Plaintiff refused to take Senna, so Defendant Gerlach increased other

medications.    Plaintiff believed that Senna was damaging his liver and called Defendant Gerlach a liar.  Plaintiff then informed Defendant Gerlach that he was named as a defendant in a lawsuit. Plaintiff informed Defendant Gerlach of his belief that the MDOC medical staff was worthless and incompetent.   (PageID.1570.) Although, Plaintiff had a mild enzyme elevation, it was his belief that he has a serious disease. (PageID.1570.)   On August 6, 2018, Defendant Gerlach examined Plaintiff for the last time.  Defendant Gerlach reordered fiber and continued the treatment plan. (PageID.1577-1584.)  Plaintiff was argumentative and threatened legal action.

## Analysis of Plaintiff's Eighth Amendment Medical Claims

Plaintiff received extensive treatment for his medically documented chronic obstipation/constipation issues.  Plaintiff has failed to show that any Defendant acted with deliberate indifference to a serious medical need.   Plaintiff received regular medical care, laboratory tests, and imaging studies that confirmed that he was receiving appropriate medical care.

### Defendant Dr. Papendick

Defendant Papendick was the Utilization Management Outpatient Medical Director during his involvement with Plaintiff's medical care.  Defendant Papendick was not involved in the day-to-day care of patients.  He evaluated requests for medical services and consultations that required treatment at facilities outside the prison. (Affidavit of Keith Papendick, M.D., PageID.1586.)  Defendant Papendick denied the request for a colonoscopy on April 13, 2017, recommending that Plaintiff receive Senna to treat constipation.  On May 30, 2017, he denied the request for an abdominal

31

CT scan by recommending a reevaluation of the Plaintiff's abdomen once his constipation was resolved.  On June 7, 2017, he recommended informing Plaintiff that he might need to endure some watery stool in order to clear his constipation and that an abdominal ultrasound was not medically necessary.  On August 28, 2017, he approved Plaintiff for a colonoscopy.  The colonoscopy was normal.  On March 22, 2018, he denied Plaintiff a gallbladder ultrasound as not medically necessary and responded with an alternative treatment plan for the use of Senna.  Plaintiff has not shown that Defendant Papendick acted with deliberate indifference in violation of the Eighth Amendment.  In fact, when Plaintiff received an approved colonoscopy the results were normal.  When Plaintiff manipulated the medical system by pretending that he overdosed to go to the emergency room, he received an ultrasound that was normal.

### Defendant Dr. Bonefeld

Defendant Bonefeld, was a medical provider at the MBP during Plaintiff's incarceration at that facility.  (Affidavit of George Bonefeld, D.O., PageID.1588-1589.) Defendant Bonefeld ordered an x-ray of Plaintiff's abdomen on May 1, 2017, which showed constipation.  On August 28, 2017, Defendant Bonefeld ordered a colonoscopy. The results of the colonoscopy were normal.  Defendant Bonefeld documented that Plaintiff had informed prison staff that he overdosed on medication and that when he arrived at the hospital emergency room, he informed medical staff that he did not take any pills.  Defendant Bonefeld had no other involvement.  Defendant Bonefeld's actions of ordering Plaintiff an x-ray and colonoscopy and documenting medical facts

could not rise to the level of deliberate indifference to a serious medical need necessary to support an Eighth Amendment claim.

### Defendant Dr. Sylvie Stacy

Defendant Stacy acted as the Utilization Management Outpatient Medical Director reviewing an October 10, 2017 request for an abdominal ultrasound. (Affidavit of Sylvie Stacy, M.D., PageID.1590-1592.)  Defendant Stacy determined that an ultrasound was not medically necessary and suggested that Plaintiff's constipation was likely causing his pain.  She further determined that after the constipation resolved further imaging studies could be considered.   Plaintiff has failed to show that Defendant Stacy acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment in making this one-time recommendation.   In fact, as previously explained, when Plaintiff subsequently received an abdominal ultrasound, the results were negative.

### Defendant Dr. Gerlach

Defendant Gerlach, became involved as Plaintiff's medical provider after he transferred to the ICF.  (Affidavit of Roger Gerlach, M.D., PageID.1593-1595.) Defendant Gerlach treated Plaintiff between May and August of 2018.  Defendant Gerlach initially reviewed Plaintiff's chart and documented that Plaintiff needed a "comprehensive bowel program."   Plaintiff refused Senna to treat his chronic constipation.  Defendant Gerlach increased Plaintiff's medications and ordered fiber for his diet.  Defendant Gerlach ordered an x-ray which confirmed that Plaintiff had constipation. Plaintiff has failed to show that Defendant Gerlach acted with

deliberate indifference toward a serious medical need in violation of Plaintiff's Eighth Amendment rights.

## Lack of Deliberate Indifference

In the opinion of the undersigned, Defendants Papendick, Bonefeld, Stacy and Gerlach took appropriate medical actions in response to Plaintiff's gastrointestinal complaints and medical issues.  Plaintiff received extensive treatment from these medical providers and other medical providers while he was housed at both the MBP and the ICF.  Plaintiff's complaint is not that he was denied medical care.  Plaintiff believes that he has a serious disease and that he requires additional medical tests and procedures to resolve his abdominal issues.  Plaintiff has gone to great lengths to manipulate the system.  It is undisputed that he lied about overdosing on medication just so he could go to the hospital emergency room to request medical imagining tests.  When he received those tests, the results were normal.  Plaintiff does suffer from chronic constipation/obstipation.  Plaintiff has received extensive medical care.  Plaintiff disagrees with the course of his treatment.

The undersigned finds that Plaintiff has failed to place verifying medical evidence in the record to establish the detrimental effect of any delay in medical treatment he received as a result of medical treatment decisions made by his physicians.  Furthermore, Plaintiff has failed to allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  The record establishes only that Plaintiff disagreed with his physicians.

In the opinion of the undersigned, Plaintiff has failed to show that any Defendant acted with deliberate indifference to his alleged serious medical needs.

### Defendant Corizon Health, Inc.

Plaintiff argues that Defendant Corizon Health, Inc., violated his 8th Amendment rights. A private entity which contracts with the state to perform a traditional state function like providing healthcare to inmates, like Corizon Health, Inc., can "be sued under § 1983 as one acting 'under color of state law.'" *Hicks v. Frey,* 992 F.2d 1450, 1458 (6th Cir. 1993) (quoting *West v. Atkins,* 487 U.S. 42, 54 (1988)). The requirements for a valid § 1983 claim against a municipality apply equally to private corporations that are deemed state actors for purposes of § 1983. *Starcher v. Corr. Med. Sys., Inc.,* 7 F. App'x 459, 465 (6th Cir. 2001) (recognizing that the holding in *Monell* has been extended to private corporations); *Street v. Corrections Corp. of Am.,* 102 F.3d 810, 817-18 (6th Cir. 1996); *Rojas v. Alexander's Dept. Store, Inc.,* 924 F.2d 406, 409 (2d Cir. 1990); *Cox v. Jackson,* 579 F. Supp. 2d 831, 851-52 (E.D. Mich. 2008).

Like a municipality, a private corporation, may only be liable under § 1983 when its policy or custom causes the injury, regardless of the form of relief sought by the plaintiff. *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 38-39 (2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1974)). In a municipal liability claim, the finding of a policy or custom is the initial determination to be made. *Doe v. Claiborne County*, 103 F.3d 495, 509 (6th Cir. 1996). The policy or custom must be the moving force behind the constitutional injury, and a plaintiff must identify the policy, connect

the policy to the governmental entity and show that the particular injury was incurred because of the execution of that policy.  *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Alkire v. Irving,* 330 F.3d 802, 815 (6th Cir. 2003); *Doe*, 103 F.3d at 508-09.

Plaintiff has failed to identify an unconstitutional policy, custom, or procedure used by Defendant Corizon Health, Inc., which violated his 8th Amendment right to receive medical care that caused a Defendant to act with deliberate indifference to his serious medical needs.  In addition, because Plaintiff has failed to show that any Defendant violated his 8th Amendment rights, Plaintiff has similarly failed to show that Defendant Corizon Health, Inc., engaged in conduct that violated his constitutional rights.

### Motions for Injunctive Relief

Plaintiff filed motions requesting a temporary restraining order or preliminary injunctive relief.  Plaintiff allegedly was transferred to the Woodland Correctional Facility on December 26, 2018, by a mental health professional because he only ate five meals between November 6, 2018, and December 12, 2018. On December 26, 2018, Plaintiff filed a motion requesting a preliminary injunction (ECF No. 69): (1) to have all of his property returned to him, (2) to have his legal mail delivered to him on the same day of arrival at the prison, (3) to have his medical mail opened in his presence on the same day of arrival at the prison, (4) to require the MDOC to provide him with paper, pens, envelopes, carbon paper, folders, and a writing desk with adequate lighting, (5) to have access to an electrical outlet for his typewriter, (6) to

have daily access to the law library, photocopy machine, and court rules at least five days per week, (7) to require the MDOC to provide him with one hour of telephone use per day, (8) to require the MDOC to provide him with 30 minutes per day of JPAY use, (9) to require the MDOC to provide reading glasses and eye glasses, (10) to require the MDOC to no longer remove property from Plaintiff and in the event of a transfer to a new prison order that his property must be packed and sealed in his presence, (11) to order that Plaintiff must be present anytime his property is searched by the MDOC, (12) to require the MDOC to immediately replace Plaintiff's property when it cannot be located, (13) to prohibit the MDOC from using any type of forced injections, and (14) any other orders that the Court deems necessary.

On January 3, 2019, Plaintiff filed a motion for a TRO and a preliminary injunction (ECF No. 77) for proper medical care.  Plaintiff asserts that he has a .59 cm mass on his gallbladder and has suffered for years with abdominal pain and with elevated liver enzymes.  Plaintiff requests that the Court order the MDOC to take him to a qualified Gastroenterologist and order a CT scan.  On January 25, 2019, Plaintiff filed a motion to supplement his requests for a TRO and a preliminary injunction (ECF No. 97) and a motion for a TRO and preliminary injunction.  (ECF No. 98.)  Plaintiff alleges that Defendants conducted a psychiatric examination of him without his consent and transferred him to a mental health facility without first obtaining a court order.  Plaintiff asserted that he is at risk of being administered psychiatric or psychotropic medication without his consent.  Plaintiff believes that this is being done to interfere with his ability to pursue these legal issues.  Plaintiff

requests that the Court order: (1) the MDOC to stop the involuntary mental health treatment, (2) require video and audio recordings of all future evaluations and examinations, (3) immediately schedule Plaintiff for a psychiatric evaluation by a specialist of Plaintiff's choice, (4) immediately schedule Plaintiff to see a nerve specialist of his choice, and (5) prohibit all attempts to admit evidence of psychiatric reports, opinions, or documents without first obtaining a Court order.

## Injunctive Relief Standard

Preliminary injunctions are "one of the most drastic tools in the arsenal of judicial remedies." *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)). The issuance of preliminary injunctive relief is committed to the discretion of the district court. *Ne. Ohio Coal. v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000). In exercising that discretion, a court must consider whether plaintiff has established the following elements: (1) a strong or substantial likelihood of success on the merits; (2) the likelihood of irreparable injury if the preliminary injunction does not issue; (3) the absence of harm to other parties; and (4) the protection of the public interest by issuance of the injunction. *Id.* These factors are not prerequisites to the grant or denial of injunctive relief, but factors that must be "carefully balanced" by the district court in exercising its equitable powers. *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *see also Ne. Ohio Coal.*, 467 F.3d at 1009. Moreover, where a prison inmate seeks an order enjoining state prison officials, the court is required to proceed with

the utmost care and must recognize the unique nature of the prison setting.  *Glover v. Johnson*, 855 F.2d 277, 284 (6th Cir. 1988); *Kendrick v. Bland*, 740 F.2d 432, 438 n.3 (6th Cir. 1984).  The party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances.  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

### Likelihood of Success on the Merits

Under controlling Sixth Circuit authority, Plaintiff's "initial burden" in demonstrating entitlement to preliminary injunctive relief is a showing of a strong or substantial likelihood of success on the merits of his section 1983 action.  *NAACP v. Mansfield*, 866 F.2d 162, 167 (6th Cir. 1989).  Plaintiff has not made such a showing. For the reasons previously explained, Plaintiff has failed to show that any of the named Defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment.

Plaintiff has infused new medical allegations in his injunctive relief motion. Plaintiff alleges that a mass was discovered on his gallbladder and that he has being forced to undergo psychiatric evaluation.  Plaintiff asserted that he is being forced to undergo mental health treatment to interfere with his access to the courts.  Plaintiff has not supported these new claims with medical evidence.

Defendants have presented evidence showing that Plaintiff suffers with constipation/obstipation.  Each of the medical Defendants made this diagnosis with the aid of laboratory results and numerous abdominal and chest x-rays.  Plaintiff also

received a colonoscopy with normal results.  Contrary to Plaintiff's claim, the result of April 30, 2018, ultrasound was unremarkable.

Moreover, Plaintiff has not made allegations in support of his injunctive relief requests that involve any actions of a Defendant. The Court does not have jurisdiction in this case to enforce orders against the MDOC or every individual who works in a Michigan prison simply because Plaintiff filed this lawsuit against some individuals who also work at a prison.   Plaintiff has not established that any of the named Defendants are currently involved in his medical health care or confinement.

In addition, a party seeking a preliminary injunction must show a relationship between the irreparable injury claimed in the motion and the claims pending in his complaint.  *Colvin v. Caruso,* 605 F.3d 282, 299-300 (6th Cir. 2010).  A motion for preliminary injunction is not the means by which a plaintiff already in court on one claim can seek redress for all other conditions of confinement that he finds actionable. Simply put, a plaintiff is not entitled to a preliminary injunction on claims not pending in the complaint.  *Ball v. Famiglio,* 396 F. App'x 836, 837 (3d Cir. 2010).

### Remaining Factors

A plaintiff's harm from the denial of a preliminary injunction is irreparable only if it is not fully compensable by monetary damages.  *Overstreet*, 305 F.3d at 578. Plaintiff has failed to assert factors that establish that he will suffer irreparable harm in the absence of an injunction.

Finally, in the context of a motion impacting on matters of prison administration, the interests of identifiable third parties and the public at large

weigh against the granting of an injunction.  Any interference by the federal courts in the administration of state prison matters is necessarily disruptive.  The public welfare therefore militates against the issuance of extraordinary relief in the prison context, absent a sufficient showing of a violation of constitutional rights.  *Glover v. Johnson*, 855 F.2d 277, 286-87 (6th Cir. 1988).  That showing has not been made here.

## Recommendation

For the foregoing reasons, I respectfully recommend that the Court:

1. GRANT the motion for summary judgment, filed by Defendants Gluesing, Wixtrom, Harbaugh, Miniard, Davis and Christiansen, asserting that Plaintiff failed to exhaust his available administrative remedies (ECF No. 66); and

2. GRANT the motion for summary judgment, filed by Defendants Corizon Health, Inc., Papendick, Bonefeld, Stacy and Gerlach, asserting that Plaintiff's claim that Defendants were deliberately indifferent to his serious medical needs fails to establish a genuine issue of material fact, and a related motion, filed by Defendant Gerlach, asserting that Plaintiff failed to exhaust his available administrative remedies (ECF No. 122).

If the Court adopts these recommendations with regard to the summary judgment motions, then Defendants Gluesing, Wixtrom, Harbaugh, Miniard, Davis, Christiansen, and Gerlach should be dismissed without prejudice due to Plaintiff's

failure to exhaust his administrative remedies.[10]  In addition, Defendants Corizon Health, Inc., Papendick, Bonefeld, and Stacy should be dismissed with prejudice due to Plaintiff's failure to establish his Eighth Amendment claims.

If the Court rejects these recommendations, in whole or in part, then the Court will be required to address Plaintiff's motions for injunctive relief. With respect to these motions, I respectfully recommend the Court:

1. DENY Plaintiff's motion for a preliminary injunction (ECF No. 69);

2. DENY Plaintiff's motion for a temporary restraining order and preliminary injunction (ECF No. 77); and

3. DENY Plaintiff's motion for a temporary restraining order and preliminary injunction (ECF No. 98).

Should the Court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997), *overruled in other part by LaFountain v. Harry*, 716 F.3d 944, 951 (6th Cir. 2013).  For the same reasons that the undersigned recommends granting Defendants' motions for summary judgment, the undersigned discerns no good-faith basis for an appeal.  Should the Court adopt the report and recommendation and should Plaintiff appeal this decision, the Court will assess the $505 appellate filing fee pursuant to § 1915(b)(1), unless Plaintiff is barred from proceeding *in forma*

---

[10] This ruling would also result in the dismissal of all of the Defendants in Plaintiff's 1st Amendment retaliation claim.

*pauperis*, e.g., by the "three-strikes" rule of § 1915(g).  If he is barred, he will be required to pay the $505 appellate filing fee in one lump sum.

**NOTICE TO PARTIES**:  Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:   April 25, 2019                                    /s/ *Maarten Vermaat*
                                                           MAARTEN VERMAAT
                                                           U. S. MAGISTRATE JUDGE